RYAN J. CLARKSON (SBN 257074)
rclarkson@clarksonlawfirm.com
YANA HART (SBN 306499)
yhart@clarksonlawfirm.com
BRYAN P. THOMPSON (SBN 354683)
bthompson@clarksonlawfirm.com
**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

LAURENCE D. KING (SBN 206423)
lking@kaplanfox.com
MATTHEW B. GEORGE (SBN 239322)
mgeorge@kaplanfox.com
BLAIR E. REED (SBN 316791)
breed@kaplanfox.com
CLARISSA OLIVARES (SBN 343455)
colivares@kaplanfox.com
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1501
Oakland, CA 94612
Tel: (415) 772-4700
Fax: (415) 772-4707

*Interim Co-Lead Counsel*

JOSEPH W. COTCHETT (SBN 36324)
jcotchett@cpmlegal.com
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
KARIN B. SWOPE (*Pro Hac Vice*)
kswope@cpmlegal.com
ELLE D. LEWIS (SBN 238329)
elewis@cpmlegal.com
CAROLINE A. YUEN (SBN 354388)
cyuen@cpmlegal.com
**COTCHETT, PITRE & MCCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Tel: (650) 697-6000
Fax: (650) 697-0677

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER LANDSHEFT, individually, and on behalf of all others similarly situated, <br><br>          Plaintiff, <br><br>     v. <br><br> APPLE INC., <br><br>          Defendant. | Case No. 5:25-cv-02668-NW <br><br> **Consolidated Class Action** <br><br> **JOINT DECLARATION OF RYAN CLARKSON, BRIAN DANITZ,  AND LAURENCE KING IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT** <br><br> Date:    June 17, 2026 <br> Time:   9:00 a.m. <br> Judge: Hon. Noël Wise <br> Crtm:   3 – 5th Floor |

We, Ryan Clarkson, Brian Danitz, and Laurence D. King, declare and state as follows:

1. I, Ryan Clarkson, am a member of the Bar of the State of California and a managing partner at Clarkson Law Firm, P.C., and a founder of the firm. ("Clarkson").

2. I, Brian Danitz, am a member of the Bar of the State of California and a partner at the law firm of Cotchett, Pitre & McCarthy, LLP ("Cotchett, Pitre & McCarthy").

3. I, Laurence D. King, am a member of the Bar of the State of California and a partner at the law firm of Kaplan Fox & Kilsheimer LLP ("Kaplan Fox").

4. On May 22, 2025, the Court appointed us interim co-lead counsel in this Action.[1]

5. We submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement. We have personal knowledge of the facts stated herein and if called upon as witnesses, could and would testify to the facts set forth herein.

6. Attached hereto as **Exhibit 1** is a true and correct copy of the Class Action Settlement Agreement and Release ("Settlement").

7. Attached hereto as **Exhibit 2** is a true and correct copy of the Declaration of Jonathan Carameros, Senior Vice President and Head of Strategy, Class Action and Mass Tort Settlement at Verita Global, LLC ("Carameros Declaration").

8. Attached hereto as **Exhibit 3** is a true and correct copy of the Declaration of Bryan Heller, Chief Operating Officer at Covalynt ("Heller Declaration").

9. Attached hereto as **Exhibit 4** is a true and correct copy of the Expert Declaration of Steven P. Gaskin ("Gaskin Declaration").

10. Attached hereto as **Exhibit 5** is a true and correct copy of the Expert Declaration of Colin B. Weir ("Weir Declaration").

**PROCEDURAL HISTORY**

11. On March 19, 2025, Plaintiff Landsheft, represented by Clarkson, filed the first putative class action in this matter, which was assigned to this Court. Seven related actions were then filed in, removed to, or transferred to this District, including those filed by Plaintiffs represented by Cotchett, Pitre

---

[1] Capitalized terms are defined in the Settlement.

& McCarthy and Kaplan Fox. Rather than engaging in protracted, contested leadership practice, Plaintiffs' Counsel coordinated early and agreed that this case would require substantial resources to litigate on multiple fronts. They organized accordingly and began collaborating on strategies to advance the litigation efficiently, avoiding unnecessary delays associated with consolidation, multi-district litigation, removal and transfer motions, and contested lead counsel appointment procedures. Recognizing that effective prosecution would require a well-resourced leadership structure - both in personnel and financial capacity - Plaintiffs' Counsel jointly submitted a stipulated leadership proposal to the Court, together with counsel's declarations and firm resumes documenting their extensive collective experience in prosecuting consumer fraud class actions. The Court granted that proposal on May 22, 2025, appointing Ryan Clarkson of Clarkson Law Firm, Brian Danitz of Cotchett, Pitre & McCarthy, and Laurence King of Kaplan Fox as Interim Co-Lead Counsel. ECF No. 28. Interim Co-Lead Counsel are not aware of any conflicts of interests that would preclude them or their firms from continuing to fairly and adequately represent the proposed Settlement Class.

12.     Following appointment as Interim Co-Lead Counsel, Plaintiffs implemented a time and expense tracking and reporting protocol intended to promote efficiency and avoid unnecessary billing, consistent with practices used in other coordinated litigations.

13.     Following extensive factual and legal research, including the vetting of hundreds of potential class representatives to secure representation across nearly every state, Interim Co-Lead Counsel prepared a Consolidated Class Action Complaint ("CCAC"). Filed on July 21, 2025, the CCAC spans more than 200 pages and includes over 1100 paragraphs of allegations, 69 Plaintiffs serving as putative class representatives, and 54 causes of action asserted under the consumer protection statutes of nearly every state. ECF No. 39.

14.     On September 25, 2025, Apple filed its motion to dismiss the CCAC. ECF No. 47. In its briefing, Apple advanced multiple defenses, including whether Plaintiffs adequately alleged reliance on Apple's advertising and marketing of the Enhanced Siri features to satisfy the heightened pleading standard under the Federal Rule of Civil Procedure 9(b). Apple also argued that its marketing was not misleading because many of Enhanced Siri's features were already available with the rollout of the iPhone 16 and that others were understood by consumers to be forthcoming with future software updates. Apple

also challenged the viability of a nationwide class, contending that the California choice of law provision in its Terms of Use was neither operative nor assented to at the time the alleged misconduct. These arguments previewed the core issues Apple intended to raise at later stages of the litigation, including class certification, summary judgment, and trial. Plaintiffs filed their Opposition to Apple's Motion to Dismiss on November 6, 2025, addressing these arguments and reinforcing the sufficiency of their claims. ECF No. 60. Apple's Reply brief was filed on December 3, 2025. ECF No. 64.

15.    While preparing the CCAC, Plaintiffs actively negotiated with Apple regarding initial case management procedures, scheduling, and the scope of discovery, while also interviewing, consulting, retaining, and working with multi-disciplinary experts. Plaintiffs and Apple held a Rule 26 conference on July 29, 2025. Plaintiffs issued an initial set of 68 document requests on October 1, 2025. Plaintiffs also developed drafts of written discovery materials, including a proposed protocol for the production of electronically-stored information ("ESI") and a stipulated protective order governing the confidential treatment of documents, and engaged in substantial discussions with Apple regarding these matters. In doing so, Interim Co-Lead Counsel analyzed ESI and protective orders previously negotiated by Apple in other matters and the protocols entered in this District, to ensure that their proposals were both reasonable and consistent with prevailing practice.

16.    To facilitate the review of forthcoming document productions and to support these efforts, including forensic imaging of Plaintiffs' phones, Plaintiffs solicited and evaluated proposals from potential ESI vendors through a competitive bidding process and retained a vendor. Apple responded to Plaintiffs' document requests with a set of wide-ranging objections that necessitated significant efforts to meet and confer.

17.    Apple made its first production of documents on December 3, 2025, and began rolling productions thereafter. To facilitate the document review, Plaintiffs drafted a document review and coding protocol manual and documents were assigned to a dedicated team of attorneys. Apple continued rolling productions of documents both during the course of litigation and settlement negotiations as confirmatory discovery. Plaintiffs also served two sets of Interrogatories to which Apple provided detailed and substantive verified responses regarding the development and timing of the Enhanced Siri features and other core facts critical to further understanding the company's potential culpability. Where details

remained unclear, Apple provided follow-up clarification and detail through the course of several conversations. Plaintiffs also conducted an informal interview with a designated Apple employee to ensure all remaining questions were answered.

18.    Plaintiffs also retained an investigative firm to assist in identifying potential whistleblowers and the roles of relevant Apple personnel. Plaintiffs' counsel separately gathered and catalogues all public statements, filings, social media posts, and reporting concerning Apple Intelligence and the Enhanced Siri features. Plaintiffs' Counsel also researched the retailers and resellers likely to possess class member information, consumer complaints, and pricing data relevant to damages, and drafted and served subpoenas to such retailers. Throughout the litigation, Plaintiffs monitored all developments concerning Apple's rollout of Apple Intelligence and the Enhanced Siri features, including software updates, departures of key Apple AI personnel, and potential third-party development partnerships with Apple.

## CLASS COUNSEL CONDUCTED EXTENSIVE INVESTIGATION

19.    In sum, Class Counsel conducted an extensive investigation, research, and analysis of the Settlement Class's claims and possessed sufficient information to assess the strengths and weaknesses of the Parties' respective claims and defenses. Prior to finalizing the Settlement, Plaintiffs' investigation and discovery included: (1) conducting a comprehensive and ongoing factual investigation and related legal research to prepare the consolidated and later operative complaints, including analysis of the nature, scope and reach of Apple's marketing of the Enhanced Siri features and Apple Intelligence, the pervasive nature of the marketing campaign which, to a significant degree, took place on social media platforms; researching consumers' reactions to Apple's marketing campaign; (2) researching, evaluating, and comparing Apple's AI business strategies to competing AI products and services, and researching sales and pricing information for iPhones and competitors' products; (3) serving both formal and informal document requests and interrogatories, and engaging in extensive discovery negotiations; (4) analyzing Apple's production of 14,471 documents comprising 38,315 pages of documents and other files including videos, spreadsheets totaling almost 100 GB of data; (5) investigating potential witnesses, including relevant Apple personnel to identify relevant document custodians and deponents involved in AI development and marketing; (6) issuing and analyzing the substantive responses to two set of interrogatories; (7) interviewing multiple experts across all key dimensions of the case, retaining and

working with experienced subject matter experts on damages who performed a comprehensive conjoint survey and provided expert analyses based on real-world data to determine the viability and the value of Plaintiffs' claims; and (8) interviewing Apple representative witness during confirmatory discovery to clarify and verify several remaining issues. Finally, the Parties also exchanged substantial data and other information regarding their respective claims and defenses during the mediation sessions overseen by Judge Phillips and the two additional mediators.

### MEDIATION WITH JUDGE LAYN R. PHILLIPS (RET.)

20.     While briefing Apple's Motion to Dismiss and engaging in discovery, the Parties agreed to retain the Hon. Layn R. Phillips (Ret.) of Phillips ADR, a nationally recognized mediator for the largest and most complex legal disputes across the country. The Parties attended an initial full-day mediation session with Judge Phillips on October 24, 2024. In advance of that mediation, the Parties exchanged detailed mediation briefs and rebuttal reports outlining their respective positions. Apple also produced documents and information in advance of the mediation to enable the Parties to engage in a productive mediation. Prior to the mediation, Plaintiffs worked with their experts to conduct consumer surveys and related analyses to assess the range of potential damages. At the mediation, the parties presented oral arguments highlighting core evidence on both sides, and Judge Phillips assisted by Caroline Cheng, a former General Counsel for PricewaterhouseCoopers LLC and Principal Deputy White House Counsel for President Barack Obama, and Clay Cogman, who has assisted with over 500 mediations, including the recent $1.5 billion class action settlement involving Anthropic that recently received preliminary approval from the Hon. William Alsup (Ret.). The participation of these two experienced mediators, in addition to Judge Phillips, demonstrates the importance and complexity of this case as each devoted significant time working with the Parties throughout the months' long mediation process. While the matter did not settle during that full day of mediation, the Parties agreed to have a second day of mediation on December 8, 2025.

21.     After the first mediation, the Parties continued to litigate the case, including by completing the briefing on Apple's Motion to Dismiss, and continuing to meet and confer regarding the ESI Protocol, the Stipulated Protective Order and Apple's productions of documents and information.

22.    With the resulting fact record significantly enhanced, the Parties submitted supplemental mediation briefs and other materials in advance of the December 8, 2025, mediation. At the end of the second full day of mediation, the Parties were closer to a resolution on some key issues; but still deadlocked on others. The case ultimately reached a settlement in principle late in the day. During the following nine days, the Parties continued to negotiate and finalize the term sheet, including a provision for confirmatory discovery to ensure the Settlement was in the best interests of the Class.

23.    At all times, the settlement discussions were conducted at arms' length and were informed by comprehensive fact and expert discovery, and applicable law. On December 18, 2025, the Parties notified the Court that they had reached an agreement in principle to resolve this matter on a nationwide class basis and requested a continuance of appliable hearings and deadlines. ECF No. 65. The Court granted the Parties' request, directing them to file a joint report updating the Court on the status of the settlement or to file a motion for preliminary approval by March 18, 2026.

24.    Over the next three months, Plaintiffs engaged in substantial confirmatory discovery as well as thorough competitive bidding process with potential Settlement Administrators. The Parties also continued to meet and confer regarding the final settlement terms. On March 13, 2026, the Parties filed a Joint Status Report and jointly requested an additional 5 weeks to finalize the Settlement Agreement and file the Motion for Preliminary Approval, as the Parties were unable to resolve all disputes regarding the material terms of the Settlement despite their good faith efforts.

25.    Following additional briefing, the Parties returned to Judge Phillips on March 23, 2026 for a third full-day mediation session aimed at resolving the remaining, highly contested issues. During that session, several remaining disputes were resolved through the Mediator's arbitral determinations, while others required further discussion and development. At the Mediator's direction and under his team's close supervision, the Parties engaged in extensive follow-up efforts, including the exchange of additional information and consultations with third-party vendors in an effort to bridge the remaining gaps. Despite these sustained and arms-length efforts, they could not resolve the remaining issues. The Parties thereafter submitted further targeted briefing during the week of April 6, 2026, upon which Judge Phillips issued rulings that ultimately resolved the outstanding issues and enabled the Parties to finalize the Settlement.

**TERMS OF THE SETTLEMENT AND ESTIMATED RECOVERY**

26. The Settlement provides substantial monetary relief in the form of a non-reversionary $250 million Total Settlement Fund that will be distributed to Settlement Class Members on a pro rata basis. This amount will be paid into a non-reversionary Qualified Settlement Fund that will be used to pay Notice costs and costs of administering the Settlement, to pay any approved Attorneys' Fees and Expenses to Class Counsel and any Service Awards to the Class Representatives, and to distribute the Net Settlement Amount to Settlement Class Members.

27. The Settlement Agreement provides that Claimants are entitled to a presumptive payment from the Net Settlement Amount of $25 per Eligible Device, with a per-device cap of $95. The Net Settlement Amount will be allocated to Claimants who submit valid Claim Forms during the Claim Period establishing that they purchased an Eligible Device in the United States during the Class Period (e.g. between June 10, 2024, and March 29, 2025), and that, at the time of purchase, they expected to receive a Siri Apple Intelligence feature and did not receive it. These amounts are subject to a pro rata upward or downward adjustment based on the amount of funds available for distribution to Class Members submitting Valid Claims. In no event will any portion of the $250,000,000 Total Settlement Amount revert to Apple.

28. If final approval is granted, each Settlement Class Member submitting a valid claim or claims will automatically receive their Settlement Payment through their preferred form of payment such as digital payments through Venmo, PayPal, or by check. The proposed Long Form Notice (Exhibit D to the Settlement Agreement) provides this information and further details on Plaintiffs' proposed notice plan, which will include direct notice by email or, where email is unavailable, by U.S. Mail., Email and postcard notice will be supplemented with follow-up reminders, as reasonably necessary to maximize deliverability and receipt. The notice plan is also described in more detail in the accompanying Declaration of Jonathan Carameros ("Carameros Declaration"), the Senior VP & Head of Strategy, Class Action & Mass Tort Settlement at Verita Global ("Verita"), attached hereto as **Exhibit 2**. Verita, the proposed Settlement Administrator, was selected through a competitive bidding process as discussed below. Verita will work with Covalynt to analyze claims, identify and remove fraudulent submissions, and increase claims rate by enriching data for valid Class Members to improve and update contact information used for

email notice. Covalynt's work is further described in the accompanying Declaration of Bryan Heller, Chief Executive Officer of Covalynt, attached hereto as **Exhibit 3**.

29.    Under the Settlement Agreement, the Administrator will implement a comprehensive and robust notice program designed to drive a higher claim rate. Apple will provide the Administrator with contact information to enable them to direct Notice through email and/or mail to the vast majority of Class Members according to information provided by Apple.

30.    Consistent with the Northern District of California's guidance, the notice program also includes publication notice to newspapers and other widely read media outlets, as well as Online Media Campaign through online advertisements, including appropriate advertising channels such as paid online ads via Google, Meta or other ad platforms, as well as social media channels such as Facebook. The Settlement Website is also designed to enable access and includes a Spanish language version of the Long Form Notice and the Claim Form, as well as a toll-free helpline with a live operator. Upon request, Class Members can request that a claim form, or other settlement documents be mailed to them.

31.    Settlement Class Members will retain all rights to object, comment on, or opt-out of the Settlement pursuant to prevailing law and the Northern District's Procedural Guidelines for Class Action Settlements.

## REVISED SETTLEMENT CLASS DEFINITION

32.    On May 1, 2026, Plaintiffs filed a proposed Second Consolidated Amended Class Action Complaint ("SCAC"). ECF No. 76. The Settlement Class definition will be consistent with that alleged in the SCAC and reflects two minor expansions of the Class. First, it will add purchasers of iPhone 15 Pro and iPhone 15 Pro Max which were anticipated to receive the Enhanced Siri features. Second, the class period will commence on June 10, 2024 (instead of September 13, 2024). The expanded Settlement Class and Class Period were modified early in the settlement process, well vetted during settlement negotiations, and resulted in additional settlement value to the Class. The SCAC also has added a plaintiff who purchased the iPhone 15 Pro Max.

## REASONABLENESS OF THE SETTLEMENT

33.    Plaintiffs determined that the settlement is reasonable, fair, adequate, and in the best interests of the Class, given the risks to success on liability and to the amount of any potential recovery.

In addition to all of the typical challenges a complex class action case brings, this case involves the development, implementation, and marketing of groundbreaking AI technology associated with one of the world's most recognizable products, the iPhone. Apple, represented by able counsel at Covington and Burling LLP, mounted a vigorous defense in all aspects of the case and would continue to do so through class certification, summary judgment, trial and appeals.

34.    While Plaintiffs believe their claims are strong, there were significant factual and legal issues that were not typical and that presented real risks to Plaintiffs' successful litigation of this case through trial.

35.    Class Counsel are not aware of any prior cases involving a high-profile marketing campaign involving alleged false advertising about AI technology for as ubiquitous a product as the iPhone that was advertised on such a multiplicity of non-traditional channels that has laid a blueprint for litigation. This differentiates this case from those arising from typical consumer fraud actions predicated on misrepresentations in traditional ads or on labels.

36.    The case involves cutting edge AI technology being developed in a rapidly developing landscape where tectonic shifts in the marketplace could occur at any time that may readily impact consumer awareness, expectations, and experiences in ways that could have unexpected consequences more than other false advertising or even technology cases Class Counsel has prosecuted.

37.    Apple maintained that its ads were not misleading because it disclosed that some Apple Intelligence functionality would be available only through later software updates, with disclaimers such as: "This feature is in development and will be available in future software updates."

38.    Apple has also argued that it successfully delivered more than 20 Apple Intelligence features, raising questions regarding the materiality of the alleged statements concerning the Enhanced Siri features.

39.    Apple has also maintained that consumers purchase new iPhones for any number of reasons that have nothing to do with the Enhanced Siri features.

40.    This case also raises a number of legal issues of first impression that are inherently risky, such as whether consumers could demonstrate reliance on representations about AI-integrated products software and whether Plaintiffs could isolate the damages associated with such representations. There is

much more limited trial court, and virtually no appellate court, opinions involving AI products and services compared with more traditional false advertising claims.

41.	In sum, Plaintiffs faced a significant risk that, after years of litigation, there would be no recovery at all. While Plaintiffs firmly believe that their liability case is strong and class certification is warranted, it is uncertain whether the Court would ultimately grant certification or deny Apple's dispositive motions. And, even if Plaintiffs ultimately proved their case at trial, the amount of recovery, if any, could be reduced. Importantly, even if there was a recovery, it would take years to secure, and Apple would undoubtedly appeal any adverse judgment. Guided by substantial investigation, informal and confirmatory discovery, and expert analysis, Class Counsel considered all of these issues and risks in weighing whether and how to fairly settle this case.

42.	The Settlement here falls well within the acceptable range of Court-approved class action settlements seeking recovery for consumers in false advertising cases.

**CLASS COUNSEL ENGAGED EXPERTS TO VALUE THE CLASS CLAIMS**

43.	To determine potential damages, Plaintiffs sought to determine the value consumers placed on Apple's representations about the Enhanced Siri features in connection with the sales of iPhones. Accordingly, Plaintiffs engaged experienced experts to perform a survey and an economic analysis of the facts presented here. Their work is detailed in the accompanying expert declarations of Steven P. Gaskin and Colin B. Weir, attached hereto as **Exhibit 4** and **Exhibit 5**, respectively.

44.	As detailed in his declaration, Mr. Gaskin ran a consumer survey and applied a choice-based conjoint analysis that was designed to estimate the market price premium, if any, of the Eligible Devices with the Enhanced Siri features compared with the same Eligible Devices without the Enhanced Siri features. Based on the survey and analysis, Mr. Gaskin concluded that the price premium due to a change from an iPhone that "Includes Basic Siri" to an iPhone that "Includes an AI Enhanced Siri" is 5.5% of the overall cost of the device.

45.	As detailed in his declaration, Mr. Weir applied Mr. Gaskin's conclusions to sales data for the Eligible Devices to determine the quantum of class-wide damages in this case. Mr. Weir concluded that in the event Plaintiffs ultimately prevailed at trial, the maximum damages attributable to the price premium applied to all of the Eligible Devices sold during the relevant period, estimated to be 37,078,131,

would be $2,264,064,781. *See* Weir Decl., ¶¶61, 67-68.

46.    In sum, Plaintiffs' experts' analysis revealed that consumers would have placed a 5.5% price premium on the Eligible Devices due to the challenged representations. *See* Exhibit 4 and Exhibit 5. Based on pricing sales and pricing data produced by Apple, which indicate an average sales price of $1,110 across the more than 37 million Eligible Devices, this represents a total damages scenario of approximately $2,264,064,781 across the class, or a $61.06 per device at the average price of the Eligible Devices. *See* Weir Decl., ¶¶ 61, 67-68. Accordingly, the total amount offered in settlement represents approximately 11% of the potential estimated recoveries if Plaintiffs were to proceed under their primary legal theories. *Id.* However, for those who file claims, at $25 per device, the settlement represents approximately 40% of the price premium, and potentially more depending on the number of claims made.

## SETTLEMENT ADMINISTRATION

47.    Plaintiffs engaged in a competitive bid process to select the proposed Settlement Administrator, Verita Global, in this case. Plaintiffs prepared a written Request for Proposal ("RFP") that was submitted to four experienced class action administrators. In the RFP process, Class Counsel required all bidders to provide representations and warranties regarding their practices that specifically addressed the allegations currently being litigated in MDL No. 3162, *In re Class Action Settlement Administration Litigation*.

48.    After receiving three bids in response to the RFP, Class Counsel engaged in follow-up meetings and several rounds of bids to adjust to the specific needs of this case. The bids also needed to be modified after several disputed issues were resolved by the Parties. Class Counsel selected Verita, based on its detailed bid and also because Verita had the requisite experience, data security measures and other capabilities that we believed would be appropriate in this matter. We have selected Verita as a settlement administrator in the past two years in four total matters across three firms, including two for Clarkson, none for CPM, and two for Kaplan Fox After selecting Verita, we again fine-tuned the notice plan based on the resolution of additional disputed issues with the assistance of the Mediator. The ultimate notice plan was also informed by detailed discussions with Apple's counsel regarding the notice plan, including Apple's understanding that they have direct notice information (email or physical address) for the vast majority of Class Members (as high as 99% of the registered users of the applicable devices).

49. The resulting notice plan is robust, and will include direct notice by email or mail, publication notice, and a Media Plan to inform the public concerning the settlement and to drive a higher claims rate, as well as the Settlement Website and a help-line to assist Class members with Claims. Based on the information provided by Apple, Verita estimates the administration of this Settlement will not exceed $5,444,056, which is inclusive of postage and Verita's fees. Additional information on the proposed notice plan is contained in the accompanying Declaration of Jonathan Carameros.

50. Given the increasing prevalence and sophistication of fraud in the settlement claims process, Plaintiffs have also implemented enhanced safeguards designed to detect, deter, and prevent fraudulent claims. To that end, Covalynt will work with Verita to employ advanced data analysis and validation protocols to identify suspect submissions, while also updating and enriching stale or incomplete data to improve notice accuracy and maximize participation by eligible Class Members. Covalynt's qualifications, including work in other similar matters, is set forth in the accompanying Declaration of Bryan Heller, Verita and Covalynt have collaborated on other class action settlements and Covalynt's costs are integrated fully into Verita's bid.

## SERVICE AWARDS

51. Each Plaintiff who signed the Settlement Agreement will seek a service award for their work on behalf of the Settlement Class. Plaintiffs intend to request up to $2,000 per Plaintiff in this case, which amounts to $130,000 for all service awards. Each Plaintiff has dutifully performed their duties in this case, including retaining counsel, providing documents and information to counsel for investigatory and discovery purposes, timely responding to inquiries from counsel, and being prepared to sit for a deposition when asked. Counsel are unaware of any conflicts between Plaintiffs and the Class Members.

## ATTORNEYS' FEES AND EXPENSES

52. The Settlement Agreement permits Plaintiffs to seek an award of Attorneys' Fees and Expenses but does not contain any clear sailing provision and no undisclosed side agreement exists with Apple not to oppose those requests up to a certain amount. Accordingly, Plaintiffs intend to file a Motion for Attorneys' Fees and Expenses seeking an award of attorneys' fees not to exceed 28% of the Total Settlement Amount, or $70 million. Pursuant to section N of the Court's Standing Order for All Civil Cases, Class Counsel intend to request that the Court hold back ten percent (10%) of any fee award until

after the post-distribution accounting has been filed with the Court.

53. As of April 30, 2026, the approximate lodestar for co-lead counsel and members of the Executive Committee is $11,912,039.50, having devoted approximately 12,723.69 hours to litigating this Action. These amounts include all time from the investigation of the complaint through April 30, 2026. Should preliminary approval be granted, Class Counsel will provide a complete, audited accounting of their lodestar and hours billed in connection with their motion for attorneys' fees and costs, which Class Members will have the chance to review and comment on before the objection deadline. A summary of the hours and lodestar figures by firm is included below:

| Role | Firm Name | Hours | Lodestar Total |
|---|---|---|---|
| Interim Co-Lead Counsel | Clarkson Law Firm | 5,907 | $5,449,935.50 |
| Interim Co-Lead Counsel | Cotchett, Pitre &McCarthy | 3,601.46 | $3,351,323.50 |
| Interim Co-Lead Counsel | Kaplan Fox | 2,319.75 | $2,494,982.50 |
| Executive Committee | Chimicles Schwartz Kriner & Donaldson-Smith LLP | 240.00 | $196,977.50 |
| Executive Committee | Miller Shah LLP | 119.10 | $80,060.00 |
| Executive Committee | Pomerantz LLP | 337.10 | $177,907.50 |
| | Janove PLLC | 25.70 | $15,005.00 |
| | Malk & Pogo Law Group LLP | 172.78 | $145,848.00 |
| | **TOTAL:** | 12,723.69 | $11,912,039.50 |

54. Class Counsel will also seek reimbursement for expenses not to exceed $600,000.00. These expenses include (i) costs paid out from the litigation fund maintained by Class Counsel, totaling $225,685.70, including expert costs, ESI vendor fees, mediation fees, and other similar costs; and (ii)

additional costs separately incurred and advanced by counsel totaling $123,326.85, including filing fees, service fees, legal research charges, travel and lodging costs, and similar costs. Such expenses were necessarily incurred in this Action and are routinely charged to clients billed by the hour. Per the Northern District's Procedural Guidelines, Class Counsel specify that to date, of the total costs, $93,543.75 has been billed and paid to date for experts, with additional invoices to follow for which they will be paying and seeking reimbursement from the Settlement Fund of approximately $40,000.00. Class Counsel anticipate incurring additional expenses in connection with completing this case - estimated up to $250,987.45, including travel and lodging for preliminary and final approval hearings, hearing-related costs (e.g. transcripts), any outstanding mediation-related fees, document management and hosting fees from the ESI vendor, and other litigation support expenses associated with finalizing the settlement.

55.    Class Counsel anticipate incurring substantial fees after the filing of preliminary approval, including managing a large-scale notice and corresponding with hundreds (if not thousands) of potential class members, preparing and filing their fee motion, overseeing settlement administration, addressing opt-outs and objections, continuing coordination with experts and consultants, addressing any post-distribution, and appeals.

56.    The Settlement Agreement provides that after entry of the Court's final order approving any Attorneys' Fees and Expenses Payment, the Settlement Administrator will pay Class Counsel any Court-approved Attorneys' Fees and Expenses Payment from the QSF no later than two (2) business days after the Apple's transfer of the Court-approved Attorneys' Fees and Expenses Payment to the QSF, which payment will be subject to the Undertaking attached as Exhibit G to the Settlement Agreement.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on May 5, 2026, at Malibu, California

*/s/ Ryan J. Clarkson*

Ryan J. Clarkson

Executed on May 5, 2026, at Burlingame, California.

*/s/ Brian Danitz*

Brian Danitz


Executed on May 5, 2026, at Oakland, California.

*/s/ Laurence D. King*

Laurence D. King

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Ryan J. Clarkson, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of May, 2026, at Malibu, California.

*/s/ Ryan J. Clarkson*
Ryan J. Clarkson, Esq.
